IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 4:02CR3040 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| THOMAS EDWARD BAILEY, | ) | |
| | ) | |
| Defendant. | ) | |

Most of the time, we should sentence a person without regard to the pain and damage our sentence will inevitably inflict upon his or her children. The exceptions to this rule are few and far between. Indeed, when I first skimmed the motion to depart under U.S.S.G. § 5K2.0[1] in this case, my reaction was quick and visceral: "Are you kidding me?" The Assistant Federal Public Defender asked me to impose a non-prison sentence on Bailey, a fellow who possessed child pornography, *in order to save the defendant's little girl*. No way, I thought, hell will freeze over before that happens.

I next explain how hell froze over. With Booker[2] in mind, I also explain why normal departure theory, rather than the "mix-and-match" approach that I have previously scorned,[3] is capable of dealing with this truly unusual case. There is no

---

[1]The motion was based upon the 2001 Guidelines Manual which the government agreed was applicable. As we shall see, use of the 2001 Manual made a big difference.

[2]United States v. Booker, 125 S. Ct. 738, 764 (2005) (declaring the mandatory nature of the Guidelines to be unconstitutional, but creating a remedy that "requires judges to take account of the Guidelines together with other sentencing goals").

[3]United States v. Wanning, 354 F. Supp. 2d 1056 (D. Neb. 2005) (construing Booker; asserting that the advisory Guidelines should be given heavy weight and judges should not "mix and match" the statutory goals of sentencing to suit their

need to invent a new jurisprudence to do so.[4]  Instead, I can grant the motion and impose a non-prison sentence following more than a decade of law developed under the Guidelines.

In so doing, I also recognize that Congress changed the law in 2003 to prohibit this type of departure in cases involving child pornography and other crimes involving children and sexual offenses.[5]  Had I been required to apply the 2003 law, and the

_____

personal views about crime and punishment when imposing a sentence).

[4]We also need not wrench from the context of the numerous sentencing statutes, the advisory Guidelines, and the remedial opinion in Booker, the single, isolated phrase "not greater than necessary," found in 18 U.S.C. § 3553(a), as a justification for the imposition of a wimpy sentence.  "Not greater than necessary" has practical meaning within the several months of a particular Guideline range.  It means nothing more than "don't be too harsh" in any other setting and the phrase therefore dissolves into meaninglessness when applied outside a Guideline range (unless, of course, you want it to mean whatever you want it to mean).  Indeed, I have expressed raw skepticism about use of this passage as the motivating factor for sentences outside the Guidelines.  United States v. Tabor, ___ F. Supp. 2d ___, 2005 WL 894898, at *7 n.14 (D. Neb. Apr. 18, 2005).  This caused one bright professor to become "puzzled" since, so he suggests, I apparently ignore a portion of a statute that Congress wrote and I am otherwise big on listening to Congress.  See Douglas A. Berman, A punchy, though puzzling, perspective on parsimony (Apr. 19, 2005), *available at* http://sentencing.typepad.com/sentencing_law_and_policy/2005/week 16/index.html. The answer to the professor's (mock?) perplexity, is that, using my Booker discretion, I would read the "parsimony" provision *with* the Guidelines heavily in mind, and he, and others who abhor Congress' harshness, would read the "parsimony" provision *without* the Guidelines much in mind.  Tell me, honestly, dear readers, which *discretionary* approach is more consistent with (1) what Congress and the Commission intended, (2) how statutes (as a whole) are to be construed, (3) the remedy chosen by the Supreme Court in Booker, and (4) the proper role of federal judges under Article III?  If you pick Doug Berman's view, then, as Emily Litella used to say, "never mind."

[5]18 U.S.C. § 3553(b)(2) (2003).  U.S.S.G. § 5K2.0(b) (2004) and U.S.S.G. § 5K2.22, p.s. (2004) implement these changes.  Moreover, a second paragraph was

Guidelines as amended in relationship thereto, one wonders whether this case would have warranted a variance or deviation from the advisory Guidelines since a departure would have been otherwise prohibited.[6]  Thankfully, I do not need to reach that hard question.

## I.  BACKGROUND

I first review the salient facts regarding the defendant.  Then I review the awful facts regarding Bailey's daughter, Cheyenne.[7]

---

added to U.S.S.G. § 5H1.6 (2004), effective April 30, 2003, which makes family ties and responsibilities and community ties irrelevant in determining whether a sentence should be below the applicable Guideline range in cases like this one involving the exploitation of children.

[6]Since <u>Booker</u> only struck 18 U.S.C. § 3553(b)(1), and not 18 U.S.C. § 3553 (b)(2), one also wonders how to apply this surviving statutory direction (curtailing departures in these types of cases) when one is also required to treat the Guidelines as advisory.  <u>See, e.g.</u>, <u>United States v. Sharpley</u>, 399 F.3d 123, 127 n.3 (2nd Cir. 2005) (while declining to rule on issue because any error was harmless, the court saw "no unique feature of Guidelines sentences for child crimes and sexual offenses that would prevent them from violating the Sixth Amendment in the same manner as Guidelines sentences for other crimes" and stating further that "[f]or this reason, we suspect that the Supreme Court's failure to excise the entirety of Section 3553(b) was simply an oversight").  Given the ex post facto issue discussed in a later footnote, I need not confront that question in this case.

[7]Although the departure motion was also predicated upon the impact that a prison sentence might have on Bailey's older children, I do not grant the motion out of a concern for those kids.  The impact on those children, although hard and unpleasant to be sure, would be no more severe than "normal," and thus serves as no basis for departure. <u>See</u>, <u>e.g.</u>, <u>United States v. Petersen</u>, 25 F. Supp. 2d 1021 (D. Neb. 1998) (family circumstances of defendant convicted on plea of guilty of receiving, via computer, visual depictions of minors engaging in sexually explicit conduct were not substantially different from those facing families of any other defendant about to be incarcerated and did not warrant downward departure in sentencing; although

-3-

I derive these facts from two sources. The first source is the very excellent, independent presentence investigation report[8] (PSR) for which there is no pertinent objection.

The second source is Exhibit 1 (Ex. 1), a large three-ring notebook containing 411 pages of materials, which is offered into evidence by the defendant. The government has no objection to Exhibit 1, and the government produced no counter evidence.

### A. Bailey and His Crime

The following is what seems most important about Baily and his crime, to wit:

\*   *Background of the Crime:*   Bailey came to the attention of the FBI during the course of an investigation known as "Candyman." (PSR ¶ 14.) "Candyman" involved an "e-group" on Yahoo and perhaps elsewhere.[9]  Following the

---

defendant's child had cystic fibrosis and defendant's medical insurance paid for child's care, there was no evidence that defendant's former wife was unable or unwilling to provide insurance, especially in light of fact that she had alerted police to defendant's activities, and requested that sentencing court impose maximum sentence allowable).

[8]Citations to the PSR refer to the Second Revised Presentence Investigation Report.

[9]For more details on this unusual web group and the government's investigation into it, see United States v. Bailey, 272 F. Supp. 2d 822 (D. Neb. 2003) (denying motion to suppress). An e-group "is a web-based communications service that allows users to create communities for posting messages and sharing photos and files on topics of common interest. Each [such group] has its own website address or Uniform Resource Locator (URL)." United States v. Shields, No. 4:CR-01-0384, 2004 WL 832937 (M.D. Pa. Apr. 14, 2004).

execution of a search warrant in Houston, Texas, "subscriber lists" to various "e-groups" were obtained, and Bailey's name, like numerous others, was found. Thereafter, the FBI served a search warrant at the offices of an insurance agency in Omaha, Nebraska, where Bailey worked as a customer service representative. (PSR ¶ 15.) Located on the computer that Bailey used to do his work were about 40 pictures of child pornography that Bailey obtained by accessing Yahoo e-groups. Accordingly, Bailey was charged with possession of child pornography taking place on or about December 21, 2001, carrying a penalty of 0 to 5 years in prison, a $250,000 fine, and 3 years of supervised release. 18 U.S.C. § 2252(a)(4)(B) (2002).[10]  Bailey ultimately pled guilty.

\*   *The Government Calls the Case "Unique":*   The government advised the probation officer that this case is "unique" as compared to "other cases involving the possession of child pornography." (PSR ¶ 16.) While Bailey obtained about 40 pictures of child pornography by accessing the e-group several times, those pictures were not permanently stored by Bailey. Rather, they remained only on "the temporary internet cache in his computer" and Bailey "did not take steps that have been normally associated with possessing child pornography for the purpose of keeping it for long periods of time." (Id.) According to the government, "[t]his distinguishes [Bailey's] case from other cases that have been prosecuted in this district." (Id.) The defendant also provided a detailed report from a computer expert who concluded that the

> majority of the images charged in the defendant[']s indictment are Temporary Internet Files and thus not downloaded to the defendant[']s computer by his conscious choice but rather, by the default settings in his operating

---

[10]The penalty was increased in 2003 to provide for a prison sentence of up to 10 years. Pub. L. No. 108-21, § 103(a)(1)(C)(i), 117 Stat. 652 (April 30, 2003).

-5-

> system.  One of these Temporary Internet Files is in fact a
> woman of legal age.
>
> The remaining three images found in the defendant[']s
> Recycle Bin appear to have actually been downloaded . . .
> but were immediately deleted into the Recycle Bin.  In my
> opinion, such an action is the antitheses of a collector . . . .

(Ex. 1, at 383 (Report of Marcus K. Lawson (January 4, 2003)).)

The probation officer, while not finding that Bailey was entitled to a role reduction, agreed that Bailey was not the "typical" offender and that fact "may very well" warrant a sentence different from "the sentencing guideline calculations contained herein."  (PSR at 23 (Addendum).)  As a result, I sustained the defendant's objection to the presentence report and gave Bailey a 2-point role reduction under U.S.S.G. § 3B1.2(b) (2001).[11]

---

[11]Although Bailey was the only person charged in the indictment, and Bailey was only charged with possession and not trafficking, since the relevant conduct involved more than one person (the parties or party maintaining the "Candyman" web site and the defendant and others who used the site), Bailey was eligible for a role reduction.  See U.S.S.G. § 3B1.2, comment. (n.2) (2001).  See also United States v. Snoddy, 139 F.3d 1224, 1231-32 (8th Cir. 1998) (defendant convicted of a "sole participant" offense may nonetheless be entitled to a reduction in his or her base offense level for a mitigating role if the defendant shows:  (1) that "relevant conduct" under Sentencing Guidelines for which defendant would otherwise be accountable involved more than one participant; and (2) that defendant's culpability for such conduct was relatively minor compared to that of other participant or participants).  The fact that Bailey did not try to save the images made him substantially less culpable than the ordinary participant in "Candyman" who, in all likelihood, hoarded this bilge on their computer as a collection.  Compare United States v. Parker, 267 F.3d 839, 842 (8th Cir. 2001) (affirming conviction for possession of child pornography by physician; noting that the images were "stored on [the defendant's] computer's hard drive" and that the defendant's "collection was voluminous"), cert. denied, 535 U.S. 1011 (2002).  Compared to merely looking at dirty pictures, collecting and archiving this material provides a greater opportunity for subsequent

\*      *Offense Level:*   The government and the defendant entered into a Rule 11(c)(1)(C) plea agreement that I accepted and which limited the defendant's total offense level to no more than 16. (PSR ¶ 81.)  Since the crime occurred in December of 2001, the parties also agreed that the <u>Guidelines</u> <u>Manual</u> that was effective on November 1, 2001, would be applicable.[12]   (PSR ¶ 9.)   The probation officer set the base offense level at 15.  (PSR ¶ 21 (applying U.S.S.G. § 2G2.4(a) (2001)).)  The officer then increased the base offense level 2 points since some of the material involved prepubescent minors. (PSR ¶ 29 (applying U.S.S.G. § 2G2.4(b)(1) (2001)).)  The officer increased the base offense level 2 points more because 10 or more images were involved.  (PSR ¶ 30 (applying U.S.S.G. § 2G2.4(b)(2) (2001)).)  The officer increased the level 2 more points as Bailey used a computer in his crime.  (PSR ¶ 31 (applying U.S.S.G. § 2G2.4(b)(3) (2001)).)   With a 2-point role reduction, and 3 points for acceptance of responsibility, Bailey's total offense level stood at 16.

\*      *Criminal History:*  Bailey had two criminal history points and thus stood in Criminal History Category II.  (PSR ¶ 48.)  One of the criminal history points involved a domestic dispute with Angela Lipinski, the defendant's former wife.

---

redistribution.  As an aside, I realize that Bailey was not charged as a trafficker and I know therefore than any role comparison must be limited to persons charged with possession.  Nonetheless, Bailey was substantially less culpable than most others involved with possession of child pornography since he made no effort to store or collect it.  That said, he was not entitled to a 4-level role adjustment primarily because of the repetitive nature of his voyeurism.

[12]The government's concession was legally well-founded.  <u>See</u>, <u>e.g.</u>, <u>United States v. Borer</u>, 394 F.3d 569, 573 & n.3 (8th Cir. 2005) (Guideline amendment requiring government's motion for an additional one point for acceptance of responsibility could not be applied retroactively under the Ex Post Facto Clause of the Constitution); <u>United States v. Smith</u>, 311 F. Supp. 2d 801, 806 (E.D. Wis. 2004) (application of PROTECT Act after an offense occurs, that prohibits an otherwise available downward departure, violates the Ex Post Facto Clause of the Constitution).

(PSR ¶ 45.)  Given Ms. Lipinski's subsequent behavior (which will be detailed later), particularly as compared to the defendant's subsequent behavior, I doubted that this conviction was indicative of the defendant's propensity to commit further crimes.  Therefore, I departed downward from Criminal History Category II to Criminal History Category I pursuant to U.S.S.G. § 4A1.3, p.s. (2001).  In other words, I found that Bailey's conviction involving Angela Lipinski told me nothing about the defendant's "likelihood" to "commit further crimes."  Id.

* *Advisory Guideline Calculation Before "Heartland" Departure:*  Accordingly, with a total offense level of 16, and a criminal history category of I (resulting from a departure due to overstatement of criminal history), Bailey faced between 21 and 27 months in prison under the advisory Guidelines.  His supervised release range was 2 to 3 years.  U.S.S.G. § 5D1.2(a)(2) (2001).  His fine range was between $5,000 and $50,000.  U.S.S.G. § 5E1.2(c)(3) (2001).  Although he was statutorily eligible for between 1 to 5 years of probation, 18 U.S.C. § 3561(c)(1), Bailey was not eligible for probation under the Guidelines.  U.S.S.G. § 5B1.1, comment. (n.2) (2001).

* *Personal Characteristics:*  Save for two disastrous marriages, there is little about Bailey that is remarkable.  He is 37 years of age.  (PSR ¶ 64.)  He has no serious mental, emotional, or drug or alcohol problems.  (PSR ¶¶ 65-70.)  After growing up in a stable and loving family (PSR ¶¶ 56-58),[13] he graduated high school, took some post-high-school mechanics training, and has worked at various services jobs since then.  (PSR ¶¶ 71-74.)  Although the information is sketchy, Bailey has appears to have a  modest net worth (less than $12,000), a gross monthly income of a minimum of $1,440, and a positive monthly cash flow of about $374.  (PSR ¶ 76.)  Bailey has been unlucky in love.  He has been

_____

[13]Bailey's mother worked as a teacher and Bailey's father worked in the military and as a civil servant at an air base.  (PSR ¶ 57.)

married twice to two different women.  (PSR ¶¶ 60-61.)  His first wife was an alcoholic and manic depressive.  (PSR ¶ 60.)  His second wife, Angela Lipinski, is a hard-drug abuser, and, according to the probation officer, the relationship between Bailey and Lipinski was "extremely volatile."  (PSR ¶ 61.)[14]  Bailey has had, and presently has, custody of the three children who were born as a result of these two miserable marriages.  (PSR ¶¶ 60-61.)  Corey, age 16, and Lilly, age 14, were products of the first marriage, and Cheyenne, age 9, was the product of the second marriage.   After Bailey was charged in this case, he lost custody of Cheyenne to Lipinski. (PSR ¶ 61.)  As we shall see, Cheyenne was sexually abused while in the custody of Lipinski.  (PSR ¶ 61.)  A juvenile court in Iowa later returned custody of Cheyenne to Bailey in March of 2003 after Lipinski tested positive for marijuana and methamphetamine and she and her boyfriend failed to comply with counseling as ordered by the court.  (PSR ¶ 61.)  Bailey maintains a long-term relationship with Julie McKeown,[15] with whom he now lives.  (PSR ¶ 63.)  McKeown has one child, age 6.  (PSR ¶ 63.)  As I will discuss later, Bailey's parents are probably too old and sick to care for their three grandchildren should I send Bailey to prison.  (Ex. 1, at 11-13.)

\*      *Bailey is Not Dangerous:* Margretta Dwyer, a board-certified forensic psychologist, who specializes in the treatment of sex offenders, completed an

---

[14]This volatility was not limited to Bailey.  In 2004, Lipinski was described by an Iowa court as "often irrational and angry" and her relationship with her boyfriend was described as "fraught with violence."  (Ex. 1, at 359.)  Among other things, this judicial declaration persuaded me that Bailey's domestic-violence conviction involving Lipinski told me nothing about his likelihood to commit further crimes.  That is particularly so since that conviction is now more than seven years old, and there have been no similar charges since then. (PSR ¶ 45.)

[15]The probation officer spells the name "McKeow."  (PSR ¶ 63.)   An investigative memorandum, prepared by the Federal Public Defender's investigator, spells the name "McKeown."  (Ex. 1, at 9.)  I adopt this latter spelling.

extensive sexual and psychological evaluation of Bailey.[16] (Ex. 1, at 1-8.) This evaluation took place in Minneapolis, Minnesota, over several hours on different days. Ms. Dwyer administered both subjective and objective tests, conducted clinical interviews of Bailey, and examined the evidence in this case, including the pictures found on the computer. Dwyer described Bailey "as an honest person with little idea of what engaging with Internet pictures might lead to legally." (Id. at 1.) In short, Dwyer concluded: "I do not find Mr. Bailey to be a sexual offender. Neither do I find him to be any sort of predator. Nor do I find him to be a dangerous person, either to adults or children." (Id.) Dwyer thought Bailey looked at these pictures out of boredom. (Id. at 7.) Bailey also reported to Dwyer that he reported four of the images to a group called "Stamp it Out." (Id. at 7.) There is some evidence to suggest that Bailey did in fact report the sites to an internet group dedicated to eliminating this filth (e.g., Ex. 1, at 411 (FBI report regarding "stampit" entries on Bailey's computer)), but Bailey does not rely upon this evidence as a defense.[17] Dwyer did not think "Bailey is in need of any type of therapy . . . ." (Ex. 1, at 2.) She did believe, however, that Bailey might benefit from family counseling (Ex. 1, at 8), and,

---

[16]Unlike the soft-headed shrinks I sometimes encounter, I have previously found Dwyer to be an extremely candid and credible witness. United States v. Shasky, 939 F. Supp. 695, 698 n.2 (D. Neb. 1996). For many years, Dwyer served as the director of the well-recognized sex-offender program at the University of Minnesota Medical School, a program intended to protect the public while dealing with pedophiles, incest perpetrators, and the like; she has authored 70 peer-reviewed articles on the treatment of sex offenders; and she has served as a sponsor of the International Conference on the Treatment of Sex Offenders. Id. at 698. She has also authored a thoughtful clinician's analysis of a federal appellate court's reversal of a departure sentence in a child-pornography case. See Margretta Dwyer, et al., Downward Bid Crashes for Internet Porn Devotee[:] Compulsive Must or Impulsive Lust?, The Forensic Echo, Vol. 2, Issue 12 (Nov. 1, 1998), available at http://echo.forensicpanel.com/1998/11/1/downwardbid.html.

[17]This evidence is also far too weak to constitute a motivating factor for departure. It is, however, relevant.

as we shall see, Bailey obtained that counseling through the Iowa juvenile court.

### B.  Cheyenne's Story

There is a twisted irony to the fact that Thomas Bailey violated the law on child pornography and thus unwittingly caused his little girl to be delivered into the lasting bondage of sexual abuse.  Here are the greatly condensed, gut-wrenching facts relating to Cheyenne and the impact on her of sending Bailey to prison:

\*    *The Beginning of Trouble:*  When Bailey divorced Lipinski in 1999, he obtained custody of Cheyenne.  (PSR ¶ 61.)  In September of 1999, Cheyenne, who was born on November 14, 1995 (PSR ¶ 61), came home from a visit with Lipinski and revealed to Bailey a bruise on her perineum (the area between the thighs extending from the coccyx to the pubis).[18]  (Ex. 1, at 164 (Report of Dr. Michael J. Moran, M.D.).)  The child reported that she had been assaulted by a "stick."  (Id.)  She feared "Chad," apparently a friend of her mother's, and reported having nightmares.  (Id.)  She started to have conversations with her doll about the things "Chad" was doing to her.  (Id.)  A family doctor noted a possible tear on the child's hymen and the bruise that Bailey had observed.  (Id.)  Accordingly, the matter was referred to the police and a pediatrician. (Id.)  The pediatrician's examination was "neither indicative for or against the diagnosis of child sexual abuse."  (Id. at 165.)  The record is unclear whether this matter was further pursued by the authorities.  What is clear is that things got much worse for Cheyenne.

\*    *Iowa Court Proceedings:*  Cheyenne remained with her father, having sporadic visits with Lipinski, until March of 2002.  (Ex. 1, at 198 ¶ 6 (Order of Iowa Juvenile Court, Jan. 24, 2003).)  After Bailey was charged in this court with

---

[18]Stedman's Medical Dictionary 1349 (27th ed. 2000).

child pornography on March 20, 2002 (PSR ¶ 1), Lipinski obtained sole custody of Cheyenne in that same month.  (Ex. 1, at 198 ¶ 6.)  Thereafter, in September of 2002, the Iowa Department of Human Services began an investigation of Lipinski, her then boyfriend, Phillip Blakely, and the care they were providing to Cheyenne and Blakely's two children.  (Ex. 1, at 198 ¶ 7.)  According to the Iowa juvenile court, the investigation revealed a high level of violence between Lipinski and her boyfriend.  (Id.)  It also "confirmed[19] that Art Snook, a friend of Angela Lipinski, has sexually abused Cheyenne."  (Ex. 1, at 199 ¶ 9.)  According to Cheyenne, "Art Snook penetrated her vagina with his finger on many occasions while he was her babysitter."  (Id.)  An investigator reported that "Cheyenne was 'extremely—almost overwhelmingly—sad' as Cheyenne talked about" what had taken place in Lipinski's home.  (Id. at 199 ¶ 7.)

\*      *Bailey is Awarded Permanent Custody After a Lengthy Investigation by the Iowa Juvenile Court:*  After the Iowa juvenile court's initial findings in January of 2003 of the abuse of Cheyenne, the child was allowed to have extended visitations with her father.  (Ex. 1, at 216  (Order of Iowa Juvenile Court, Feb. 17, 2003).)  The court also ordered drug testing, relationship counseling, and family services, including parent skill building and individual and family counseling, for Bailey and McKeown, Lipinski and Blakely, Cheyenne, and Blakely's children.  (Id.)  Suffice it to state that Bailey and McKeown did everything the Iowa court requested of them, but Lipinski ignored the counseling requirement and instead engaged in drug abuse and violence.  (E.g., Ex. 1, at 226-29 (Order of Iowa Juvenile Court, Mar. 31, 2003); Ex 1, at 258-61 (Order of Iowa Juvenile Court, June 24, 2003); Ex. 1, at 287-90 (Order of Iowa

---

[19]On October 18, 2002, the Iowa Department of Human Services issued a "Notice of Child Abuse Assessment: Founded" and determined that Snook was "[r]esponsible" for "sexual abuse: second degree" regarding Cheyenne Bailey.  (Ex. 1, at 184.)  The notice was placed in the Iowa Central Abuse Registry.  (Id.)

Juvenile Court, Dec. 15, 2003); Ex. 1, at 358-60, Order of Iowa Juvenile Court, Apr. 28, 2004).)   Accordingly, physical custody of Cheyenne was transferred to Bailey in March of 2003, and the court confirmed permanent custody of Cheyenne with her father in April of 2004, terminating any further supervision of Cheyenne and Bailey by the court and the Iowa Department of Human Services.  (Ex. 1, at 358-360 (Order of Iowa Juvenile Court, Apr. 28, 2004).)[20] As vividly contrasted with Lipinski, the court concluded that "Thomas Bailey and his partner have participated in all services and have good parenting skills." (Id. at 359-60 ¶ 3.)   Notwithstanding these skills, the court observed that "Cheyenne continues to disclose details about the domestic abuse she witnessed between her mother and mother's partner" and she continued to address "her sexual abuse by a caretaker while in her mother's custody."  (Id. at 359 ¶ 3.)

\*    *The Iowa Court Was Aware of Bailey's Federal Charge and Cheyenne was Separately Represented:*  During all this time, the Iowa juvenile court was fully aware that Bailey had been charged with child pornography.  (E.g., Ex. 1, at 359.)   The Iowa court was also aware of, and relied upon, the findings of Margretta Dwyer.  (Ex. 1, at 215.)   Throughout these proceedings, Cheyenne was represented in the juvenile court either by court-appointed counsel and guardians ad litem or court-appointed special advocates.  (E.g., Ex. 1, at 197 & 287.)

\*    *Sending Bailey to Prison Would Grievously Harm Cheyenne:*  Throughout the record, and from the very beginning of the abuse of Cheyenne to the present day, the one person in her life that she consistently expresses trust in and clings to is her father, the defendant.[21]  With this in mind, I turn in detail to the 2005

---

[20]The judge did not, however, terminate Lipinski's parental rights.  (Ex. 1, at 361 (Family Connections, Inc., Progress Report, May 15, 2004).)

[21]For example, see Ex. 1, at 176: Cheyenne pleading with a social worker, while the child lived with her mother, "to go to the judge right now" and "she wants to live

report of Dr. Mario Scalora, a highly regarded forensic psychologist and expert in children and sex abuse,[22] about the impact on this 9-year-old girl of sending her father to prison.  (Ex. 1, at 370-77 (Psychological Report of Mario J. Scalora, Ph.D., Spring 2005).)  Dr. Scalora spent a lot of time to prepare himself to express an opinion.  He interviewed each member of the Bailey family.  (Id. at 370.)  He conducted a home visit and interviewed everyone again. (Id.)  He administered psychological testing relating to the children.  (Id.)  He reviewed a large group of pertinent records, including the indictment, the defendant's criminal history, school records for the children, Margretta Dwyer's evaluation of Bailey, investigative memos, counseling records for Cheyenne, and records from Iowa Protective Services regarding Cheyenne.  (Id. at 370-71.)   Scalora found the Bailey home environment to be entirely appropriate.  (Id. at 376.)  Specifically regarding Cheyenne, Scalora observed that: (1) the child was repeating second grade because of academic rather than behavioral difficulties (id. at 372); (2) all of the Bailey children, including Cheyenne, "remembered with sadness" Cheyenne's "being forcibly removed from the family home approximately three years ago by her biological mother" (id. at 373); (3) testing revealed that Cheyenne had "frequent concerns and worries regarding bad things potentially happening to her" (id.); (4) Cheyenne

---

with her dad." (Child Protective Assessment Summary, Oct. 16, 2002); Ex. 1, at 265: "Cheyenne has feared that her dad will leave her and her anxiety level is at a high." (Family Connections, Inc., Progress Report,  Aug. 15, 2003); Ex. 1, at 363: "Cheyenne trusts Tom because of the love he has shown for her and the safe and structured . . . environment in which he provides for her." (Family Connections, Inc., Progress Report, May 15, 2004).

[22]For a detailed discussion of Scalora's superb credentials, see United States v. Wehrbein, 61 F. Supp. 2d 958, 969-70 (D. Neb. 1999).  Like Dwyer, Scalora is no bleeding heart when it comes to sex offenders.  For example, hired by the Nebraska State Patrol, Scalora developed and empirically validated the risk-assessment measures used to implement the Nebraska Sex Offender Community Notification Act. Id. at 970 n.6.

had a "clinically significant level of fears and anxiety"[23] (id. at 374); (5) Cheyenne had "chronic difficulties with bed wetting" (id.); (6) Cheyenne had "occasional nightmares as well as intrusive memories[24] of the [sexual] abuse" (id.); and (7) "Cheyenne made it clear to the undersigned that she views her father, stepmother, and siblings as protective of her. . . . Cheyenne also related great concern that she would be returned to her biological mother's custody if separated from her father."  (Id. at 375.)   Scalora concluded that he had "significant concern" for Cheyenne should she be separated from her father because the child suffered from "symptoms consistent with Posttraumatic Stress Disorder"[25] and Bailey was "critical" to Cheyenne's continued recovery. (Id. at 377.)

\*   *Other Caretakers:*  Should I send Bailey to prison, it is clear that Lipinski, whose parental rights have not been terminated, would not be a suitable custodian for Cheyenne.  Although a caseworker in Iowa tried to contact Cheyenne's maternal grandmother, the record does not reflect any success in doing so.  (Ex. 1, at 296.)  Bailey's mother is in her late sixties and has major, life-threatening heart problems.  (Ex. 1, at 11-12 (Interview of Pauline Bailey, Apr. 16, 2004).)  Bailey's father is 75 years of age and he has continued working to provide health care for his wife.  (Id.)  Bailey's mother tearfully reported that she and her husband would do their best to try to care for all three children should Bailey be sent to prison, but she predicted "that the kids would probably be given to the state to raise." (Id. at 11.)   While McKeown appears

---

[23]"Cheyenne also admits to being nervous at home when her father is not around and fears being taken away from him again.  Further, she calls her father at work 'all the time' because 'it is nice to hear his voice.'"  (Id. at 374.)

[24]"Cheyenne elaborated that she is quite frightened when thunderstorms erupt as she was molested by her biological mother's friend during a storm."  (Id.)

[25]This is a major mental illness which can afflict children.  See Diagnostic and Statistical Manual of Mental Disorders 424-26 (4th ed. 1994) (DSM-IV).

to be a suitable custodian for Cheyenne, given the fact that McKeown has no legal relationship to Cheyenne, one worries that Lipinski would have a superior legal right to Cheyenne inasmuch as Lipinski's parental rights have not been terminated. All of the foregoing is somewhat beside the point since no caretaker can provide the "critical" emotional support that Bailey provides Cheyenne in overcoming her emotional trauma caused by the sexual abuse.

## II. ANALYSIS

I first discuss the departure question in this case. In so doing, I rely upon and follow standard departure theory that was developed long before <u>Booker</u>. While time-consuming to apply, I find that this theory is entirely sufficient to deal with this unique case. I then explain that this case shows why we should continue to use the analytic provided by the advisory Guidelines rather than try to reconceptualize things using our <u>Booker</u> discretion. Lastly, I also touch upon the 2003 amendments to the statutes and the resulting 2004 Guideline amendments regarding cases involving children and sex crimes. In this regard, I seek appellate guidance as to the impact of <u>Booker</u> on these changes.

### A.  A Departure Is Warranted Because the Cost to an Innocent Member of Society  (Cheyenne) of Sending the Defendant (Bailey) to Prison Indisputably Outweighs the Benefits to the Public of Imprisoning the Offender

Many judges (including me) have whined about the Guidelines prohibiting them from considering the quirks of a given case. In a lot of cases, that complaint does not accurately mirror the reality. The Guidelines, while certainly not elastic, are not as rigid as we make out. I next explain how that is true in this case.

U.S.S.G. § 5H1.6 (2001) tells us that "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." However, the Sentencing Guidelines permit a departure

from the sentence otherwise required when there "'exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'"   U.S.S.G. § 5K2.0 (2001) (quoting 18 U.S.C. § 3553(b)).   A district court is entitled to depart under the provisions of U.S.S.G. § 5K2.0 when it applies the analysis required by Koon v. United States, 518 U.S. 81 (1996) (explaining proper approach that a district court should follow when granting non-government departure motions; establishing an abuse-of-discretion standard of review).

The Court of Appeals has described the process a district court must follow when applying Koon.  United States v. Woods, 159 F.3d 1132, 1134 (8th Cir.1998) (affirming downward departure for exceptional charitable works). It described the process this way:

> Before departing from the Guidelines, a sentencing court first must determine whether a particular case presents features that "take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case."   Koon, 518 U.S. at 95, 116 S. Ct. 2035. The court must then decide whether the Sentencing Commission has forbidden, encouraged, or discouraged departures based on those features. While a forbidden factor may not be used as a basis for departure, an encouraged factor may be considered if the Guidelines have not already taken it into account. A discouraged factor—or an encouraged factor already taken into account—may also be used as a basis for departure if the factor is present to an exceptional degree. If the factor is unmentioned, the sentencing court must consider the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," and decide whether the factor is sufficient to take the case out of the heartland. Id. at 96, 116 S. Ct. 2035 (citing United States v. Rivera, 994 F.2d 942, 949 (1st Cir.1993)). The Commission specifically said that it did "not intend to limit the kind of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case."   U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).

-17-

Id. at 1134.

It is noteworthy that the Supreme Court has adopted Justice Breyer's methodology which he set out in United States v. Rivera, a decision authored when the Justice served as a circuit judge. Koon, 518 U.S. at 95 (citing and explicitly approving United States v. Rivera, 994 F.2d 942, 949 (1ˢᵗ Cir. 1993)). In Rivera, the court reversed the refusal of the district court to consider a departure. There, the defendant was a single mother of three small children who was sentenced to 33 months in prison for carrying a pound of cocaine from New York to Providence. Justice Breyer wrote that the district court should be "fully aware of its power to depart in 'unusual cases' and where family circumstances are out of the 'ordinary.'" Rivera, 994 F.2d at 953.

Thus, although family ties are ordinarily not relevant, once in a great while they provide a reason for a reduced sentence. From the Eighth Circuit Court of Appeals, there is precedent holding that departure is warranted where the defendant's care for an innocent family member is unquestionably irreplaceable and critically necessary to effectively provide for a significantly ill and innocent family member. United States v. Haversat, 22 F.3d 790, 797 (8th Cir.1994) (severe psychiatric illness of wife of antitrust defendant justified downward departure where doctor testified that the defendant's care was an irreplaceable part of treatment plan; 5-level departure was warranted, but sentence should have imposed some type of confinement).[26] Other circuits have come to similar conclusions. See, e.g., United States v. Dominguez, 296 F.3d 192, 199-200 (3ʳᵈ Cir. 2002) (reversing failure to depart when impact on defendant's old and sick parents was great, there was an absence of any other readily

---

[26]See also United States v. Haversat, 53 F.3d 335, 1995 WL 253173 (8th Cir. 1995) (table) (on remand, district court imposed 4-month sentence followed by 4 months of home confinement and the court of appeals affirmed), cert. denied, 516 U.S. 1027 (1995).

available sources to meet their needs, and defendant, found guilty of structuring financial transactions in aid of money laundering, was first-time offender and was not dangerous; before departure, application of Guidelines called for 37-month sentence); United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (reconsideration of a 4-level departure in fraud case based on extraordinary family circumstances warranted where defendant was single mother of 12-year-old with learning problems; such reconsideration required determination of whether child would suffer greater harm than normal child, what care would be available for child while defendant was in prison, and whether professional assistance was available for the child) (Posner, C.J.).

Likewise, other district courts have held a departure was warranted where a particularly vulnerable child was uniquely dependent upon the defendant. See, e.g., United States v. DeRoover, 36 F. Supp. 2d 531, 532-33 (E.D.N.Y. 1999) (granting 12-level departure and 5-month prison sentence for single mother of five convicted of possession of about a kilogram of heroin based in large part upon the fact that elderly grandmother could not continue to care for the children and "[o]ne child suffers from 'separation anxiety' . . . . [and] has been under psychiatric observation") (Weinstein, J.); United States v. Lopez, 28 F. Supp. 2d 953, 955 (E.D. Pa. 1998) (departing downward 6 levels in drug case where defendant's 7-year-old child was suffering from severe psychiatric illness and the defendant was the "only caregiver who has been able to make a substantial difference in Maria's life").

I, too, have come to the conclusion that where a child is especially vulnerable and the defendant truly irreplaceable to the child's recovery, a departure is warranted. United States v. Wehrbein, 61 F. Supp. 2d at 974-82 (downward departure of 8 levels to avoid prison sentence for small-time drug trafficker was warranted due to special emotional and psychiatric needs of 11-year-old boy where father was irreplaceable, mother was incapable of caring for the child, and there were no other suitable

custodians; home confinement imposed under electronic monitoring at defendant's costs) (collecting cases and journal articles).[27]

From all of these cases, and the Guidelines which form the basic undergirding for them, the following four simple rules can be derived:

1. A departure from the advisory Guidelines may be warranted when a child has a serious illness or condition, the defendant's presence is critical to the child's care, and the defendant's presence cannot reasonably be duplicated by using other providers.

2. There must be reasonable assurances that the defendant is not dangerous in order for a departure to be justified.

3. The more significant the crime (as objectively measured by the Guidelines and otherwise), the less likely it is that a departure is proper.

4. The extent of the departure must be reasonable and that is typically determined by reference to other cases. The general rule of thumb is that a departure sentence should always include some type of restraint in prison, in jail, or by use of home confinement.

These rules are essentially a harmonization of the sentencing goals set forth in 18 U.S.C. § 3553(a) as implemented by the Guidelines through application of precedents developed over a decade or more *prior* to Booker. In short, the Sentencing Guidelines and the statutory purposes of sentencing, like the goal of "just punishment" found in 18 U.S.C. § 3553(a)(2)(A), include the common-sense (utilitarian) notion that a prison sentence should always be imposed when called for under the Guidelines

---

[27]Wehrbein included an additional twist. The government could have avoided or lessened the impact on the child if the federal prosecutor had not delayed 14 months after the matter was referred before commencing a federal case. In that case, the government waited until the defendant got out of prison on state charges to prosecute him again for similar federal charges.

*unless* the benefit to society of that sentence is indisputably outweighed by the harm that sentence will cause to an innocent member of society.[28]

Applying the foregoing to the facts of this case, I conclude that Cheyenne has a serious illness or condition, Bailey's presence is critical to the child's continued recovery, and the defendant's presence cannot reasonably be duplicated by using other providers.  I also conclude there is a reasonable assurance that Bailey is not dangerous to the public (especially including children).  In addition, I am persuaded that Bailey's crime as measured by the Guidelines (total offense level 16, criminal history category I) and otherwise, while entirely reprehensible, is far less serious than the customary child-pornography cases.  Finally, I conclude, as I did in <u>Wehrbein</u>, that an 8-level departure to offense level 8, criminal history category I, providing for a probationary sentence, is reasonable.   The benefit to the public of incarcerating Bailey is indisputably outweighed by the harm that prison sentence will have on Cheyenne, an innocent member of society.

I will, however, impose a $10,000 fine, 5 years of probation (with very stringent conditions, including limitations on use of computers and possession of sexually oriented materials), and 1 year of home confinement under electronic monitoring, with the stipulation that Bailey must pay for the costs of the electronic monitoring, but that he be allowed to work.  At his cost, I will also require Bailey to submit to examination by specialists in the treatment of sex offenders and undergo clinical polygraph examinations if requested by the probation office.  That information will be made

---

[28]If one hungers for a more detailed theoretical explanation from the folks in academe, one could read Aaron J. Rappaport, <u>Rationalizing the Commission: The Philosophical Premises of the U.S. Sentencing Guidelines</u>, 52 Emory L.J. 557, 579-88 (2003), and then one might compare that article with Douglas A. Berman, <u>Balanced and Purposeful Departures: Fixing a Jurisprudence that Undermines the Federal Sentencing Guidelines</u>, 76 Notre Dame L. Rev. 21, 66-69 (2000).

available to the probation office and, with the permission of the court, to law enforcement agencies.

Aside from the children residing in his home, Bailey's contact with children under the age of 18 will be strictly limited. Furthermore, as required by 18 U.S.C. § 4042(c), Bailey will be required to register as a sex offender. Bailey's home, person, or auto may be searched by a probation officer, at night or during the day, with or without a warrant, to determine the presence of controlled substances, firearms, computer equipment, sexually explicit material, or any other contraband. Bailey will also be required to give DNA samples.

### B. Don't Start From Scratch

It is probably not too extreme to suggest that a debate "rages" among lowly federal district judges about how to use the advisory Guidelines after Booker.[29] Compare United States v. Wanning, 354 F. Supp. 2d 1056 (D. Neb. 2005) with United States v. Jaber, 362 F. Supp. 2d 365, 2005 WL 605787 (D. Mass. Mar. 16, 2005).[30] Overly simplified, the discretionary approach required by Booker that I favor

_____

[29]I hope that Congress allows this debate, which will be short-lived, to play out. If it has the mature wisdom to wait, I predict that the Courts of Appeal will adopt a Guideline-centered standard of review. If that happens, our national legislature will have the best of both worlds, that is, a sentencing system that is really tough on crime, but fully capable of dealing with the truly unique case. If, on the other hand, and after a reasonable period of time (say three years), Booker becomes a ticket to widespread, undue leniency, Congress can justifiably act armed with convincing data from the judiciary itself. By acting precipitously, Congress reinforces the (unjustified) image of a bunch of blood-starved cave dwellers looking for a fight. Sometimes one can win by waiting.

[30]While there is much that I disagree with in Jaber, only one such disagreement warrants a comment here, and then only briefly. The judge in Jaber writes that: "The Guidelines Do Not Implement the Purposes of Sentencing." Id. at *6. The sources for this bold declaration are two law review articles. Id. & n.18. Respectfully, rather

-22-

makes the Guidelines the centerpiece of sentencing, while the other approach treats the Guidelines as no more or less important than other factors.  Intending derision, I call this latter method the "mix-and-match" approach.

With this stage set, I want to make a simple point.  If I would have used the "mix-and-match" approach in this case, my work would have been far easier, but I would have sacrificed the discipline and the coherence of more than a decade of precedent, Commission exegesis, and scholarly effort.  Booker provides no good reason to start from scratch.

## C.  The 2003 Amendments

What if I could not have departed in this case by use of the Guidelines and standard departure theory?  There is a good chance that what Congress did in 2003 would have prohibited me from arriving at the result I reach today (by use of the Ex Post Facto Clause and the 2001 Manual).  See 18 U.S.C. § 3553(b)(2) (2003); U.S.S.G. § 5H1.6 (2004); U.S.S.G. § 5K2.0(b) (2004); U.S.S.G. § 5K2.22, p.s. (2004). However, as the Second Circuit has hinted, perhaps Booker can and should be read to bar application of Congress' 2003 work.  Sharpley, 399 F.3d at 127 n.3.

For those of us who give the Guidelines heavy weight, it is very important to know whether Booker nullified 18 U.S.C. § 3553(b)(2) and the amendments promulgated by the Commission in response thereto.  If Booker nullified section 3553(b)(2), then perhaps the amendments promulgated by the Commission in direct response have been blown up as well.  If so, those of us who look heavily to the Guidelines should ignore those provisions because they were specifically implemented in response to an unconstitutional statute.  Happily, I do not need to

_____

than relying upon secondary sources, one is far better advised to read the entirety of the Commission's explanation of how it dealt with the purposes of criminal punishment.  U.S.S.G. § 1A1.1, at 2-4 (Editorial Note) (2004).

address these questions today.  Before I am forced to address them, I hope my Court of Appeals will do so.  After all, that is why they get paid the big money.

IT IS ORDERED that the Bailey's motion for departure (filing 101) is granted in part and denied in part as provided herein.

DATED this 12th day of May, 2005.

BY THE COURT:
*s/Richard G. Kopf*
United States District Judge